UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NORTHSTAR SOURCING, LLC, <br><br> Plaintiff, <br> v. <br><br> ROCKET DOG BRANDS, LLC, <br><br> Defendant. | CASE NO. C16-0405RAJ <br><br> ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |

## I. INTRODUCTION

This matter comes before the Court on Plaintiff Northstar Sourcing, LLC's ("Northstar") Motion for Summary Judgment. Dkt. # 16. Defendant Rocket Dog Brands, LLC ("Rocket Dog") opposes the motion. Dkt. # 19. For the reasons stated below the Court GRANTS the motion.

## II. BACKGROUND

Plaintiff Northstar is a company headquartered in Bellevue, Washington that contracts with Chinese factories to manufacture shoes, sometimes also designing and

ORDER - 1

selling shoes directly to retailers.  Mot. at 1; Guess Decl. (Dkt. # 20) ¶ 3, Ex. B ("Perkins Dep.") at 16:18; 21:2-10.  Defendant Rocket Dog is a Delaware Limited Liability Company doing business in California and Washington that wholesales and sometimes designs shoes.  Answer ¶3; Resp. at 3 (citing Guess Decl., Ex. A ("Taylor Dep.") at 9:16-20).

In 2009, Northstar and Rocket Dog began working together.  Compl. ¶ 9; Answer ¶ 9.  Pursuant to their arrangement, Northstar manufactured shoes for Rocket Dog in China and then shipped them to the various ports identified in Rocket Dog's purchase orders.  Compl. ¶9-10; Answer ¶9-10.  Northstar then issued invoices to Rocket Dog for the fulfilled purchase orders.  Compl. ¶10; Answer ¶10.

Northstar alleges that in 2015, Rocket Dog fell behind on its payments.  Compl. ¶11-15.  Nevertheless, Northstar continued to accept purchase orders from Rocket Dog while Rocket Dog committed to paying down its debt.  Perkins Decl. ¶ 5; Guess Decl. ¶4, Ex. C ("Briskie Dep.") at 17:22-18:7.  According to Northstar, despite efforts to negotiate Rocket Dog's debt, Rocket Dog made little effort to pay down the outstanding balance.  Mot. at 2.  In September, 2015, Northstar's CEO, Robert Perkins, warned Rocket Dog that Northstar would withhold future shipments if Rocket Dog did not start paying its past-due invoices.  Perkins Decl., Ex. 4.  In January, 2016, after Rocket Dog promised and then failed to make a $150,000.00 payment on its debt, Northstar declared Rocket Dog in default and took possession of all goods that had been produced by Northstar but not yet received by Rocket Dog.  Perkins Decl., Ex. 5-6.

In particular, Northstar retained possession of shoes that Northstar had manufactured for Rocket Dog in fulfillment of an order from Rocket Dog's customer, Payless Shoes. Perkins Decl. ¶15. In order to mitigate damages, Rocket Dog agreed to transfer ownership of the existing orders from Payless to Northstar, with the effect that Northstar was paid directly by Payless Shoes for the order originally arranged by Rocket Dog. Bay Decl., (Dkt. # 17) ¶ 2, Taylor Dep. at 43:14-17; 44:12-45:3; Resp. at 6.

While the parties were negotiating the logistics of the Payless order, Mr. Perkins called several Payless representatives. *See* Guess Decl., Exs. E-G; *id.*, Perkins Dep. at 70:12-75:23. The parties disagree about the content and effect of Mr. Perkins' calls. *See id.*, Perkins Dep. at 72:18-73:12; Resp. at 9-16. Mr. Perkins testified that his conversations with the Payless representatives were solely about the logistics of transferring the Payless shipment, and that he did not discuss Rocket Dog's financial status during these calls. Guess Decl., Perkins Dep. at 72:18-73:6. In contrast, one Payless employee testified that Mr. Perkins told him Rocket Dog "potentially . . . [was] bought out by a different company in the prior summer." Guess Decl., Ex. E ("Steinhardt Dep.") at 13:6-8. Another Payless employee testified that Mr. Perkins told him Rocket Dog was in "financial distress." *Id.*, Ex. F ("Underhill Dep.") at 19:10-13. A third Payless employee, who did not talk to Mr. Perkins but was told about Mr. Perkins' calls, characterized Mr. Perkins' behavior as "unprofessional" and "unusual" and characterized Mr. Perkins' comments about Rocket Dog as "derogatory," although this employee was unable to recall anything specific he was told about Mr. Perkins' calls. *Id.* Ex. D ("Kapcar Dep.") at 10:14-25.

The Payless employees also testified that Mr. Perkins' phone calls did not affect Payless' ongoing decisions about doing business with Rocket Dog. *See* Bay Decl., Ex. B ("Hitch Dep.") at 17:19-18:11; 35:17-19 (testifying that the "style sensibility of Rocket Dog wasn't really aligned with where [Payless] was headed"); *id.*, Steinhardt Dep. at 17:7-12 (testifying that Mr. Perkins' phone call and alleged disclosure of information about Rocket Dog did not affect Rocket Dog's relationship with Payless); *id.*, Kapcar Dep. at 18:1-4 (same); Underhill Dep. at 15:14-18 (testifying that Payless remains open to doing business with Rocket Dog, assuming Rocket Dog addresses issues with vendor performance and product assortment). In contrast, Rocket Dog claims that Mr. Perkins' phone calls harmed Rocket Dog's relationship with Payless and resulted in a substantial loss of business. Resp. at 9-16.

In addition to the Payless order, Northstar also claims that Rocket Dog owes an outstanding debt of $2,094,326.00 from orders that Northstar had already produced and shipped on behalf of Rocket Dog. Perkins Decl. ¶ 15; Hofmann Decl., Exs. 1-3. The parties briefly attempted to negotiate a payment plan for this amount, but ultimately did not reach an agreement. Perkins Decl. ¶ 19, Ex. 3 at 14; *id.*, Taylor Dep. at 29:11-12.

On March 18, 2016, Northstar filed suit against Rocket Dog, alleging causes of action for breach of contract and unjust enrichment, seeking "no less than $2,185,947.93." Compl. (Dkt. # 1). Rocket Dog asserted counterclaims for breach of contract and for tortious interference with contract/business expectancy. Answer (Dkt. # 5). Northstar now moves for summary judgment on its affirmative claims and on Rocket Dog's counterclaims. *See* Mot.

Following a review of the motions and evidence, the Court found that the amount Northstar was claiming in damages varied between its Complaint, Motion for Summary Judgment, and the evidence cited in support thereof. *Compare* Compl. ¶¶ 15, 21 ($2,185,947.93), *with*, Mot. at 3 n. 1 ($2,094,325.64), Bay Decl., Taylor Dep. at 43:18-20 ($2,343,000.00). The Court ordered oral argument and offered Northstar an opportunity to cite relevant portions of the record and support its damages and interest calculations with additional evidence, if necessary. Dkt. # 23. Rocket Dog was also offered the opportunity to support its objections to Northstar's damages claim with citations to the record and additional evidence. *Id*. Both parties submitted additional evidence supporting their arguments regarding damages. *See* Dkt. #24-26. On May 25, 2017, the Court held oral argument on the subject of damages. Dkt. # 27. No party requested an evidentiary hearing.

### III.     ANALYSIS

On a motion for summary judgment, the Court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir.2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the opposing party must show that there is a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must

present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir.1991). When confronted with purely legal questions, the Court does not defer to the non-moving party.

**A.  Northstar's Affirmative Claims**

Northstar moves for summary judgment on its breach of contract claim. *See* Mot. at 6-8. Specifically, Northstar contends that it fulfilled purchase orders from Rocket Dog by manufacturing and delivering shoes for which Rocket Dog now owes Northstar $2,094,326.00 in principal and another $374,241.66 in interest. *Id*. at 6; Bay Supp. Decl. at 2. Rocket Dog counters that Northstar's records regarding the amount owed do not match Rocket Dog's. Resp. at 17; Briskie Supp. Decl. ¶¶ 3-5. Rocket Dog claims that it "made a payment at some point in December/January to that balance." Resp. at 17 (citing Taylor Dep. at 42:19-25). Rocket Dog also argues that, even if it is liable for the amount at issue, its damages based on Northstar's alleged tortious interference with Rocket Dog's Payless relationship "vastly outweigh Northstar's" damages, and therefore, Rocket Dog contends that it owes Northstar nothing. *Id*. at 16. Finally, for the first time in its supplemental submissions, Rocket Dog argues that it was owed a 10% commission on the Payless order and cancelled several orders at issue, which offsets Northstar's claimed damages. Briskie Supp. Decl. ¶¶ 3-5, 9-11, Ex. D-F.

Article 2 of the Washington Uniform Commercial Code governs this dispute because the parties are merchants and the shoes Northstar delivered are "goods." RCW 62A.2-102, 104-05; *see also Alpacas of Am., LLC v. Groome*, 317 P.3d 1103, 1105 (Wash. App. Ct. 2014). The parties do not dispute the existence of a contract, or that

Northstar performed under the contract and Rocket Dog accepted the shoes as conforming goods. *See* Perkins Decl. ¶ 20; Answer (Dkt. #5) at ¶¶ 12, 13, 15; RCW 62A.2-301, 507, 607. Rather, the parties' dispute is limited to the issue of damages.

   1. Principal

Northstar claims Rocket Dog owes $2,094,326.00 in principal, supporting its claim with its responses to Rocket Dog's interrogatories and corresponding business records. Perkins Decl., Ex. 7 at 27-31; Hoffman Decl., Exs. 1-3. The business records and accompanying spreadsheets include order numbers, associated purchase orders, dates of invoices, and the balance owed for the outstanding shipments of shoes totaling $2,094,326.00. *Id*. Northstar also cites the testimony of Rocket Dog's CFO, Scott Briskie, who testified that he has "no reason to dispute" "that [Rocket Dog] owed Northstar about $2 million in March of 2015." Guess Decl., Briskie Dep. at 15:4-8.

Rocket Dog raises several arguments in opposition, contending that (1) it does not owe Northstar damages for breach of contract because Rocket Dog's damages from its tortious interference claim dwarf Northstar's damages, Resp. at 16-17; (2) Northstar owes Rocket Dog a commission on the Payless order that offsets Northstar's damages, Briskie Supp. Decl. ¶¶ 5-8, Ex. C-E; (3) Rocket Dog cancelled some of the invoices that make up Northstar's damages calculation, *id*. ¶¶ 9-10, Ex. E-F, and; (4) Northstar's damages figure fails to subtract $900 worth of shoes that had factory errors and a further $5,227.00 that Rocket Dog cannot account for in its own records, *id.* ¶¶ 12-13. During oral argument, Northstar conceded the last category, and the Court will therefore subtract $6,127.00 from Northstar's total damages award.

First, Rocket Dog contends that it does not owe Northstar the principal or interest for the shoes because Rocket Dog is entitled to damages from its tortious interference with contract/business expectancies counterclaim that outweigh Northstar's damages claim. Resp. at 16-17. Because Rocket Dog's tortious interference claim is dismissed for the reasons explained below, Rocket Dog's first argument is moot. *See* Section III.B.

Second, Rocket Dog argues that its business records do not match Northstar's, creating an issue of material fact. Resp. at 17. In support of its argument, Rocket Dog cites the testimony of Ms. Taylor: "[I]t's my understanding . . . you have to check with the CFO, Scott Briskie, we made a payment at some point in December/January to that balance. I don't know—I can't remember what it was." Guess Decl., Taylor Dep. at 42:19-25. No more certain, Mr. Briskie testified: "I believe that there is about a $300,000 discrepancy, today between [Northstar's] $2 million rough number and [Rocket Dog's] $1.8 million number, on paper, of what the difference is." *Id.*, Briskie Dep. at 48:7-13. Mr. Briskie then testified that he has not investigated the discrepancy himself. *Id.* at 48:14-18. The ambivalent and apparently uninformed testimony of Rocket Dog's CEO and CFO is not significant and probative evidence capable of combatting Northstar's evidence or establishing a genuine issue of material fact. *Intel Corp.*, 952 F.2d at 1558.

While Rocket Dog's CEO and CFO initially testified that the potential $300,000 discrepancy was from a payment Rocket Dog made to the balance, in its supplemental submission ahead of oral argument, Rocket Dog raised a new argument, claiming it was owed commission on the shoes Northstar sold to Payless. Briskie Supp. Decl. ¶¶ 3-5. In support of this argument, Rocket Dog has provided invoices it claims that it sent to

Northstar demanding payment for the commission; invoices allegedly sent on June 28, 2016—three months after Northstar filed the current action. *Id*. ¶ 6, Ex. C.

At oral argument, the parties informed the Court that they had come to an agreement regarding a portion of the commission. Northstar has agreed to pay Rocket Dog a 10% commission on the Payless orders. *Id*.; Briskie Supp. Decl. ¶ 5, Ex. C-E. There is no apparent disagreement that Northstar owes Rocket Dog commission on the Payless order, but the parties disagree on the scope of the order, and therefore disagree on the total commission. Rocket Dog has submitted evidence demonstrating the scope of the commission: (1) Mr. Briskie's Supplemental Declaration, Briskie Supp. Decl. ¶ (2) the Master Purchase Agreement between Northstar and Payless, *id*., Ex. D, (3) a spreadsheet allegedly showing the orders for which Rocket Dog is owed commission, and (4) invoices Rocket Dog Sent to Northstar for the commission on the orders, *id.*, Ex. C.

Northstar contends that Rocket Dog's evidence demonstrates that the total commission is approximately $138,000.00, or 10% of the orders listed in the Master Purchase Agreement between Northstar and Payless. *Id*., Ex. D at 16-17. The Court agrees. None of Rocket Dog's additional evidence demonstrates an agreement that Northstar would pay commission on any orders beyond those listed. *See Id*. ¶ 5 (stating that as part of the Payless order negotiated in January 2016, Northstar owed Rocket Dog a 10% commission); *id*., Ex. D at 16-17 (listing the total orders from the agreement). The Court therefore finds that Rocket Dog is entitled to $138,000.00 in commission on the Payless order, which offsets Northstar's total damages claim.

Finally, Rocket Dog claims that Northstar's records do not account for $23,036.00 in cancelled invoices. *Id.* ¶10, Ex. D-F. As evidence, Rocket Dog has submitted cancelled purchase orders dated January 11, 2016. *Id.*, Ex. F. As Northstar noted in the oral argument, these cancelled invoices are all dated one week after the orders were shipped. *See* Bay Supp. Decl., Ex. 3 (part 1 of 4) at 189-90 (freight forwarder's cargo receipts listing a January 4, 2016 shipment date for these orders). Under the Washington UCC, unless the goods are nonconforming—which Rocket Dog does not allege here— tender "entitles the seller to acceptance of the goods and to payment according to the contract." RCW 62A.2-507(1). Accordingly, Rocket Dog's evidence merely shows that it cancelled the purchase orders after they were delivered. Even granting Rocket Dog all inferences in the most favorable light, its evidence does not demonstrate a material issue of fact regarding these orders. *Addisu*, 198 F.3d at 1134.

2. <u>Interest</u>

Northstar also seeks interest on the unpaid invoices, alleging that this amount was agreed to by the parties. Mot. at 8. In the alternative, Northstar argues that it is entitled to 12% prejudgment interest because its claim is liquidated.[1] *Id*. Northstar has produced

---

[1] "Prejudgment interest may be awarded on liquidated claims or readily determinable claims." *King Aircraft Sales, Inc. v. Lane*, 68 Wn. App. 706, 720, 846 P.2d 550, 558 (1993). "A claim is liquidated if it may be readily determined by a fixed standard without the exercise of discretion or reliance on expert opinion." *Id*. "The fact that a claim is disputed does not render the claim unliquidated, so long as it may be determined by reference to an objective source." *Id*. "This rule governs claims for prejudgment interest under the UCC as well." *Id*. "Prejudgment interest is favored in the law because it promotes justice." David K. DeWolf & Keller W. Allen, 16 Wash. Practice Series, *Prejudgment Interest* § 6:13 (4th ed. 2016). In Washington, the rate of prejudgment interest is 12% in the absence of a written agreement specifying a different rate. RCW 4.56.110; 19.52.020.

ample evidence that Rocket Dog agreed to pay interest at a rate of one percent per month on the outstanding balance, evidence Rocket Dog has not contested. *See* Perkins Decl., ¶¶ 8-9; *id*. Ex. 2-3; Bay Decl., Taylor Dep. at 43:21-44:11. This reflects an annual interest rate of 12% and a daily rate of .03288%, resulting in a total interest sum of $374,241.66 on Northstar's original damages claim. *See* Bay Supp. Decl. ¶ 1-7, Ex. 2. Northstar has now agreed to reduce its damages by $6,127.00 in factory errors and missing purchase orders, and an additional $138,000.00 to account for commission payments, resulting in a total sum of $144,127.00 that should be subtracted from the principal damages award. The resultant total principal award is $1,950,199.00.

Finding that there is no genuine issue of material fact as to Northstar's damages claim or the agreed upon interest rate, the Court awards Northstar interest in the amount of $348,487.22 on its principal damages of $1,950,199.00.

**B.     Rocket Dog's Counterclaim for Tortious Interference**

Northstar next moves to dismiss Rocket Dog's counterclaim for tortious interference with contract and business expectancies.[2] Mot. at 13-17. Rocket Dog contends that Mr. Perkins' calls to Payless interfered with the Payless-Rocket Dog relationship and led to a loss of more than eight million dollars in business. Resp. at 9-15.

---

[2] Rocket Dog appears to have abandoned its counterclaim for breach of contract, which was based on an alleged agreement between the parties that Rocket Dog would repay Northstar over the course of a year, a period of time that has now ended. Resp. at 16 n. 9. Rocket Dog has also withdrawn its counterclaim alleging that Northstar interfered with Rocket Dog's relationship with factories in China. *Id*. at 9 n. 5.

ORDER - 11

In order to demonstrate a claim for tortious interference with a business expectancy, Rocket Dog must prove: "(1) the existence of a valid contractual relationship or business expectancy, (2) that defendants had knowledge of that relationship, (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy, (4) that defendants interfered for an improper purpose or used improper means, and (5) resultant damage." *Manna Funding, LLC v. Kittitas Cty.*, 295 P.3d 1197, 1207 (Wash. App. Ct. 2013), *as amended on denial of reconsideration* (Apr. 9, 2013). Here, the Court need not address each element of Rocket Dog's tortious interference claim because Rocket Dog has submitted no evidence to support causation; its claim therefore fails as a matter of law.

Rocket Dog contends that its business relationship with Payless "changed dramatically" after Mr. Perkins' phone calls to Payless. Resp. at 10. However, four Payless employees testified that Mr. Perkins' phone calls did not affect Payless' ongoing decisions about doing business with Rocket Dog. *See* Bay Decl., Hitch Dep. at 17:19-18:11; 35:17-19; *id.*, Steinhardt Dep. at 17:7-12; *id.*, Kapcar Dep. at 18:1-4; *id.*, Underhill Dep. at 15:14-18. Payless representatives also testified that Payless was not doing additional business with Rocket Dog because Rocket Dog's shoes no longer fit Payless' needs. *See* Bay Decl., Kapcar Dep. at 17:2-25 (testifying that either the style of shoes Rocket Dog offered or the price point did not fit Payless' needs); *id.*, Underhill Dep. at 13:24-14:10 ("[Rocket Dog's] product assortment [] which they showed us really didn't fit with the direction of the department . . . [a]nd then the second reason is just

based off of vendor performance. So for the past two years that I've been with the company we've seen a decline in [Rocket Dog's] margin performance.").

To counteract this testimony, Rocket Dog offers the testimony of its CEO, who plans to testify at trial that "based on her experience, Payless had no choice but to 'move away . . . to protect one's company and self.'" Resp. at 15 (quoting Guess Decl., Taylor Dep. at 57:12-25). "[Ms. Taylor] would have made the same move if Rocket Dog were in Payless' position." *Id*. In short, to rebut the testimony of four Payless representatives with direct knowledge of Payless' business decisions, Rocket Dog offers testimony that, had their CEO worked for Payless, she would have made different decisions. *Id*. Such speculative testimony is insufficient to raise a genuine issue of fact to defeat summary judgment. *Anheuser–Busch, Inc. v. Natural Beverage Distributors*, 60 F.3d 337, 345 (9th Cir.1995).

Rocket Dog also submits a spreadsheet of 2015 orders from Payless, totaling $9.4 million, to compare with purchase orders from 2016, which total only $238,321.00. Guess Decl., Ex. I at 5-17. However, the fact that two events occurred near each other in time—Mr. Perkins called Payless and Rocket Dog's business with Payless declined—is not evidence of causation. *Mesa v. ZymoGenetics, Inc*., No. C10-1486JLR, 2011 WL 13124668, at *3 (W.D. Wash. June 6, 2011) ("That correlation proves causation, however, is a well known logical fallacy, and one this court will not entertain."). Rocket Dog has not submitted any expert testimony or any testimony from Payless that links Mr. Perkins' calls to Rocket Dog's decline in business. *See generally* Resp.; Guess Decl.

Finally, Rocket Dog contends that "Northstar has as much as conceded that its 'derogatory' and 'unprofessional' calls to Payless would damage Rocket Dog." Resp. at 14. But Rocket Dog supports this allegation by misinterpreting the testimony of Northstar's CEO. Mr. Perkins testified at length regarding his belief that Ms. Taylor should have handled the situation with Payless differently after Mr. Perkins' calls alerting Payless that Rocket Dog was in default:

> I mean, it's not for me to tell [Ms. Taylor] how to manage her relationship with Payless, but that would have mitigated those phone calls . . . [if] she would have gone in, said, look, we're going to take care of this. We're going to pay Northstar. They're going to ship the shoes. She would have come back to me, I'm going to open up letters of credit on these goods, and you're going to get paid. I would have been fine. No problem. That's how she should have managed the relationship, but she didn't. She actually went weak. She went to Payless and said, look, can you take this over for me because I just can't take care of it. And if Payless sees that, that in itself is probably the kiss of death.

Bulthuis Decl. ¶ 4, Perkins Dep. at 84:15-85:4. Instead of testifying that his calls were the "kiss of death" for the Rocket Dog-Payless relationship, as Rocket Dog contends, Mr. Perkins' "kiss of death" comment refers to the manner in which Ms. Taylor communicated with Payless and cannot be construed as a concession that Mr. Perkins' Payless calls harmed Rocket Dog. *See* Resp. at 14.

Because Rocket Dog has failed to submit any evidence that connects Mr. Perkins' phone calls to a decline in Rocket Dog's business with Payless, Rocket Dog's tortious interference claim fails as a matter of law. The Court also finds that Rocket Dog has abandoned its other counterclaims. Resp. at 9 n. 5, 16 n. 9. Accordingly, all of Rocket Dog's counterclaims are dismissed.

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTS** Plaintiff's Motion for Summary Judgment. Dkt. # 16.

Dated this 26th day of May, 2017.

The Honorable Richard A. Jones
United States District Judge